UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORNUA FOODS NORTH AMERICA, INC.,
and ORNUA CO-OPERATIVE LIMITED,

Plaintiffs,

-against-

ABBEY SPECIALTY FOODS, LLC,

Defendant.

23-CV-1212 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

This case is about the packaging on two imported, unsalted Irish butters: Kerrygold and Tipperary. Ornua Foods North America, Inc. and Ornua Co-Operative Limited (together, "Ornua" or "Plaintiffs") produce and sell the popular unsalted Irish butter Kerrygold in grocery stores across the United States. In 2021, Abbey Specialty Foods, LLC ("Abbey") also began selling an unsalted Irish butter, Tipperary, in the United States. Both companies' butters are sold in packages wrapped in metallic silver foil and each contain references to the Irish origin of the butter.

Ornua brought the instant action against Abbey for trade dress infringement, unfair competition, trade dress dilution, and deceptive business practices, claiming that Tipperary's butter package by Abbey is confusingly similar to Kerrygold's. Abbey now moves for summary judgment on each of Ornua's claims, except for Ornua's claim for trade dress dilution. Based on the undisputed facts in this case, the Court finds that the two packages are not likely to be confused and grants summary judgment in favor of Abbey.

## BACKGROUND

### I.    Factual Background

Ornua Co-operative Limited is an Irish Industrial & Provident Society with a principal place of business in Dublin, Ireland. ECF No. 44-2 ("JSMF") ¶ 1. Ornua Foods North America, Inc. is a wholly owned subsidiary of Ornua Co-operative, with its principal place of business in Evanston, Illinois. *Id.* ¶ 2. Ornua produces, markets, and sells butter made with milk from grass-fed, Irish cows under the brand name "Kerrygold." *See* ECF No. 51 ("Ornua SMF") ¶¶ 13–15. The company registered the trade dress for the package containing its unsalted butter (the "Kerrygold Trade Dress") with the United States Patent and Trademark Office ("USPTO"), registration number 6,656,205. JSMF ¶¶ 4–5. The Kerrygold Trade Dress looks like this:



*Id.* ¶ 4.

According to Ornua, Kerrygold's unsalted butter has been sold using the Kerrygold Trade Dress since 2004. Ornua SMF ¶ 21. Ornua states that between 2018 and 2022, it spent over $226 million on advertisements in North America relating to the Kerrygold brand across numerous media forms including print, television, and digital and social media. *Id.* ¶ 25. The company's efforts have apparently paid off. Since 2018, sales of Kerrygold unsalted butter, the butter

bearing the Kerrygold Trade Dress, account for over thirty percent of the United States market for unsalted premium butter products. *Id.* ¶ 31. Further, sales of Kerrygold's unsalted butter in the United States grew from $30.9 million in 2018 to $68.6 million in 2022. *Id.* ¶ 32.

Abbey, a New Jersey corporation, also sells butter made with milk from grass-fed, Irish cows. JSMF ¶¶ 3, 8. Its butter is sold under the brand name "Tipperary." *Id.* ¶ 6. On or about February 16, 2021, Abbey began selling an unsalted Irish butter in the United States in a package with the following trade dress (the "Tipperary Trade Dress"):



*Id.* ¶¶ 6, 12. Abbey's owner acknowledged that, as of December 6, 2023, he had been aware of the Kerrygold Trade Dress for more than ten years. *Id.* ¶ 11. Tipperary's unsalted butter competes directly with Kerrygold's unsalted butter. *Id.* ¶ 9. In fact, the two butters are often sold in the same retail stores. *Id.* ¶ 10.

Prior to selling the Tipperary butter in the United States, Abbey learned that a retail grocer would no longer sell Kerrygold's unsalted butter and was looking for a replacement. Ornua SMF ¶¶ 44–45, 49. The retail grocer approached Abbey about selling Irish butter in its stores. *Id.* ¶ 44. On October 28, 2019, Abbey's owner emailed a package designer pictures of the packaging for Kerrygold salted and unsalted butter. *Id.* ¶ 50. Later that day, Abbey's package designer responded to the email with model packaging for Tipperary salted and unsalted butters.

*Id.* ¶ 53. The mockup for the unsalted Tipperary butter is the same as the Tipperary Trade Dress shown above, except that an image of the Irish flag replaced an image of a harp. *Id.* ¶¶ 53, 55.

On June 26, 2020, Abbey's supplier, Lakeland, sent an email to Abbey's owner warning that "Ornua could throw the weight of their trademarks (including trade dress) into legal proceedings against . . . Tipperary Brand. For example – Ornua have [sic] a specific trademark for the gold foil and green writing, so it is important Tipperary don't walk into the same issue as Lakeland did." ECF No. 53-23 at 2. On August 5, 2020, Abbey's owner instructed the package designer to change the packaging for its salted butter from gold foil to black foil but did not change the silver packaging on the unsalted butter. Ornua SMF ¶¶ 71–72.

A side-by-side comparison of the Kerrygold Trade Dress and Tipperary Trade Dress is presented below:

 

JSMF ¶ 7.

## II.    Procedural History

Ornua filed the instant action against Abbey on February 13, 2024. ECF No. 1. On May 15, 2024, Ornua filed an Amended Complaint asserting claims for: (1) federal trademark infringement under 15 U.S.C. Section 1114, (2) federal unfair competition and false advertising under 15 U.S.C. Section 1125(a), (3) trade dress infringement under New York General Business Law Section 360, (4) deceptive business practices under New York General Business Law

Section 349, (5) dilution of the Kerrygold Trade Dress under New York General Business Law Section 360-l, and (6) unfair competition under New York common law. ECF No. 27 ¶¶ 35–82.

Abbey filed a motion to dismiss and for summary judgment on April 24, 2023. ECF No. 19. Judge Oetken, who was previously assigned to this action, denied Abbey's motion without prejudice to renewal on a post-discovery motion for summary judgment. ECF No. 35 at 1. Judge Oetken ordered the parties to engage in limited discovery regarding the likelihood that a consumer would be confused between the Kerrygold and Tipperary trade dresses, as defined by the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). *Id.* Following the completion of discovery, Judge Oetken ordered the parties to complete briefing for summary judgment by November 28, 2023. *Id.* This case, in the meantime, was reassigned to the undersigned. ECF No. 36.

On January 22, 2024, Abbey filed a motion asking the Court to dismiss the Amended Complaint, or in the alterative, grant summary judgment in favor of Abbey. ECF No. 44. Given Judge Oetken's explicit order, the fact that the parties have completed discovery on the issue of likelihood of consumer confusion, and the evidence presented before the Court, the Court treats Abbey's motion as one for summary judgment.

## LEGAL STANDARD

### I.    Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. If the movant meets its initial burden, "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); see also *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal quotation marks and citation omitted).

## II.    Lanham Act

Section 43(a) of the Lanham Act protects a product's trade dress against any person who uses "in connection with any goods . . . or any container for goods, . . . any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person." 15 U.S.C. § 1125(a). Trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *19 (S.D.N.Y. Aug. 15, 2013) (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997)).

"To establish a claim for product packaging trade dress infringement under Lanham Act § 43(a), the plaintiff must demonstrate (1) that its trade dress is either inherently distinctive or that it has acquired distinctiveness through a secondary meaning, [although] an otherwise inherently distinctive trade dress is entitled to protection only if it is also nonfunctional" and (2) "that there is a likelihood of confusion between defendant's trade dress and plaintiff's." *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 69 (S.D.N.Y. 2003) (quoting *Fun-Damental Too*, 111 F.3d at 999). To prevail on a claim for unfair competition, "a plaintiff must show that (1) he or she has a valid mark that is entitled to protection, and (2) the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 144 (S.D.N.Y. 2022).

Courts in this Circuit evaluate whether the alleged infringing product is likely to cause confusion by analyzing the following eight factors articulated in *Polaroid Corp. v. Polarad Electronics Corp.*: (1) the strength of plaintiff's dress; (2) the similarity between the two dresses;

(3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) defendant's bad faith; (7) the quality of defendant's product; and (8) the sophistication of the relevant consumer group. 287 F.2d at 495.

Analysis of the *Polaroid* factors is "not a mechanical measurement." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001). Instead, the Second Circuit has instructed that "a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (internal quotation marks and citation omitted) (affirming district court's decision on summary judgment that there was no likelihood of confusion in that case). "Although no one factor is necessarily dispositive, any one factor may prove to be so." *Nora Beverages*, 269 F.3d at 119. Additionally, "[it] is important to keep in mind that the Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

The Court first finds that the Kerrygold Trade Dress is inherently distinctive and non-functional, and thus satisfies the first prong of an infringement claim. Next, the Court analyzes whether there is a likelihood of confusion between the Kerrygold and Tipperary trade dresses, finding that none exists. Because a reasonable jury could not find that a likelihood of confusion exists, the Court grants summary judgment in Abbey's favor on Ornua's (1) Lanham Act claims for trade dress infringement and unfair competition and (2) New York law claims for trade dress infringement, unfair competition, and deceptive business practices. However, as Ornua identifies, and Abbey does not dispute, Abbey's motion does not implicate Ornua's claim for trade dress

dilution under New York General Business Law Section 360-l. ECF No. 49 ("Opp.") at 2 n.1. Therefore, this claim remains.

## I.    The Kerrygold Trade Dress Is Inherently Distinct and Non-Functional

"The focus of the distinctiveness inquiry, and the ultimate test of protectability under the Lanham Act, is whether the plaintiff's trade dress is capable of distinguishing the plaintiff's goods from those of others." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 538 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). Because "the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited," a product's trade dress is often considered inherently distinctive. *Fun-Damental Too*, 111 F.3d at 1000; *see also Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) ("Since the choices that a producer has for packaging its products are, as the Fifth Circuit noted, almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive . . . .").

Ornua argues that the Kerrygold Trade Dress is distinctive because "its silver foil and uncluttered design stand out from the crowd of unsalted butters." Opp. at 9. As support, Ornua cites to an image in its statement of material facts displaying Ornua's packaging next to packages of fourteen other brands of unsalted butters. *Id.* at 9–10 (citing Ornua SMF ¶ 24). Abbey does not contest this claim or supply any evidence to the contrary.

Turning to the functionality of the Kerrygold Trade Dress, a "design feature is functional, and thus incapable of trade dress protection, if it is essential to the use or purpose of the article, affects the cost or quality of the article, or, in cases involving an aesthetic feature, if its protection would put competitors at a significant non-reputation-related disadvantage." *Capri Sun*, 595 F. Supp. 3d at 188 (cleaned up). "A defendant bears the burden of proving functionality as a defense to a plaintiff's claim of infringement." *Id.* (internal quotation marks and citations

omitted). Here, Abbey again does not contest or adduce any evidence regarding the functionality of Ornua's packaging design.

Accordingly, the Court finds, as a matter of law, that the Kerrygold Trade Dress is inherently distinctive and non-functional.

## II.    The Abbey Trade Dress Is Not Likely to Confuse Consumers

The Court now turns to an analysis of the eight-factor balancing test supplied in *Polaroid* to determine whether Abbey's alleged infringement is likely to cause confusion. *See Nora Beverages*, 269 F.3d at 118–19 (applying the *Polaroid* test to assess the likelihood of confusion in a trade dress infringement claim). In balancing these factors based on undisputed facts, the Court concludes that no reasonable jury could find in favor of Plaintiffs.

### A.  The Kerrygold Trade Dress Is Moderately Strong

The first *Polaroid* factor, the strength of Plaintiffs' trade dress, slightly favors Ornua. This factor requires the Court to focus "on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 667 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace, *i.e.*, secondary meaning." *Id.* (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

As discussed immediately above, the Kerrygold Trade Dress is inherently distinctive. However, "[e]ven an inherently distinctive trade dress can, in its commercial context, lack strength as a trade dress." *Kind LLC v. Clif Bar & Co.*, No. 14-CV-770 (KMW), 2014 WL

2619817, at *6 (S.D.N.Y. June 12, 2014) (quoting *Nora Beverages*, 269 F.3d at 123). Thus, the Court also considers the Kerrygold Trade Dress's secondary meaning. "The Second Circuit has identified six non-exclusive factors that bear on this inquiry: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 210 (S.D.N.Y. 2022) (internal citation and quotation marks omitted). "Proof of secondary meaning entails vigorous evidentiary requirements," and a "plaintiff bears the burden of proving that his mark acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654 (quoting *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).

### 1. Advertising Expenditures

Advertising expenditures "are regarded as indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product." *Focus Prod.*, 647 F. Supp. 3d at 211 (internal citation and quotation marks omitted). However, "merely showing that a certain amount was spent on advertising provides little support for secondary meaning. It must be shown that there was promotion of the mark as an identifier for the product." *Id.* (quoting *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007).

Here, Ornua presents evidence that between 2018 and 2022, it "spent more than $226 million to develop its Kerrygold brand in North America, including the Kerrygold Trade Dress, which includes spending on national print media, television advertising, digital and social media, product demonstrations, and price promotions." Ornua SMF ¶ 25. Ornua does not specify what

percentage of the $226 million was spent on advertisements featuring the Kerrygold Trade Dress. However, Ornua provides images of the Kerrygold Trade Dress featured in magazines and on social media, indicating that Ornua promoted the Kerrygold Trade Dress as an identifier for its unsalted butter. *Id.* ¶¶ 26–27. Abbey presents no evidence to the contrary. As such, this factor supports a finding of secondary meaning.

### 2. Consumer Surveys Linking the Kerrygold Trade Dress to Kerrygold

As evidence that the Kerrygold Trade Dress "has achieved secondary meaning," Ornua introduces a consumer survey conducted by Dr. Susan MacDonald (the "MacDonald Survey") dated "November, 2023." Opp. at 10; ECF No. 53-5 at 1. "Courts in this District have long held that consumer surveys are the most persuasive evidence of secondary meaning." *Capri Sun*, 595 F. Supp. 3d at 153 (quoting *LVL XIII Brands*, 209 F. Supp. 3d at 638–39) (collecting cases). The MacDonald Survey, however, fails to identify the date range covered by the survey. That is, the survey does not make clear whether its findings cover the year 2023, a previous year, or a multi-year span. As discussed above, Plaintiffs bear the burden of proving that their trade dress "acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654. Without a date range for the data, the evidence necessarily fails to demonstrate that the Kerrygold Trade Dress acquired secondary meaning by the time the Tipperary Trade Dress came on the market in 2021. Thus, the MacDonald Survey falls short of supporting secondary meaning. This factor favors Abbey.

### 3. Unsolicited Media Coverage

Plaintiffs adduce no evidence of unsolicited media coverage. Accordingly, this factor favors Abbey.

### 4.  Sales Success

"A product's sales success may indicate whether a substantial portion of the purchasing public associates the trade dress with the product's source." *Focus Prod.*, 647 F. Supp. 3d at 213 (citing *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021)). "In assessing sales success, courts have considered sales volume, market share, whether sales grew over time, whether sales data was broken down by year, and whether sales data was convincingly linked to the mark-bearing product." *Id.* (cleaned up).

Here, Ornua presents evidence demonstrating that Kerrygold unsalted butter "has had over 30 percent of the U.S. market for unsalted premium butter products since at least 2018." Ornua SMF ¶ 31. Additionally, sales of their unsalted butter in the United States have grown from $30.9 million in 2018 to $68.6 million in 2022. *Id.* ¶ 32. Although Ornua's sales data is not broken down by year, it clearly favors Ornua. *See Focus Prod.*, 647 F. Supp. 3d at 213–14 (collecting cases demonstrating that $3 million or more in sales is supports secondary meaning).

### 5.  Attempts to Plagiarize the Kerrygold Trade Dress

"Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a strong source identifier in the eyes of the purchasing public." *LVL XIII Brands*, 209 F. Supp. 3d at 660 (internal quotation marks omitted) (quoting *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 428 (S.D.N.Y. 2012)).

Here, Ornua's evidence shows that only Abbey attempted to plagiarize the Kerrygold Trade Dress.[1] *See* Opp. at 11. Courts weigh this factor against a finding of secondary meaning

---

[1] Ornua states that a non-party to this litigation attempted to plagiarize the packaging on Kerrygold's salted butter. Ornua SMF ¶ 65. However, the Court need not consider this fact as it does not relate to the trade dress that is the subject of this litigation. Even if the Court did consider it, this additional instance of plagiarism would not affect the outcome of this case.

where the only evidence of plagiarism is the conduct forming the basis of the action. *See Wonderful Co. LLC v. Nut Cravings Inc.*, No. 21-CV-03960 (MKV), 2022 WL 4585344, at *3 (S.D.N.Y. Sept. 29, 2022); *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 600 (E.D.N.Y. 2017) (citing *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12-CV-3599 (RWS), 2013 WL 866867, at *5 (S.D.N.Y. Mar. 8, 2013) and *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001)). Accordingly, the factor favors Abbey.

### 6. Length and Exclusivity of the Use of the Kerrygold Trade Dress

"[C]ourts have indicated that continuous exclusive usage of a trade dress over a five-year period may support—but does not necessitate—a finding of secondary meaning." *Focus Prod.*, 647 F. Supp. 3d at 216 (quoting *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 67 (S.D.N.Y. 2021)). Ornua has used the Kerrygold Trade Dress "since at least 2004," far longer than the five-year period courts consider. Ornua SMF ¶ 21. This factor therefore favors Ornua.

### 7. Balancing the Factors

Three of the six factors—advertising expenditure, sales, and length and exclusivity of the trade dress's use—favor Ornua, while the consumer survey, unsolicited media coverage, and plagiarism factors favor Abbey. The first factor, advertising expenditure, only supports Ornua slightly, while the sales and length and exclusivity factors provide stronger support. On the other hand, although the absence of a meaningful consumer survey favors Abbey, the lack of unsolicited media coverage and plagiarism only maintain modest weight. On balance and although only slightly, these factors support Ornua.

Accordingly, the first *Polaroid* factor, the strength of the Kerrygold Trade Dress favors Ornua.

14

**B.  The Kerrygold and Abbey Trade Dresses Are Dissimilar**

Under the second *Polaroid* factor, the similarity of the trade dresses, courts look to "the overall impression of the products and the entirety of the trade dress" to determine consumer confusion. *Nora Beverages*, 269 F.3d at 122. "In an appropriate case, the similarity factor can be dispositive and will warrant summary judgment for an infringement defendant if the court is satisfied that the trade dresses are so dissimilar that no question of fact is presented." *Capri Sun*, 595 F. Supp. 3d at 191 (internal citation and quotation marks omitted). Although the Kerrygold and Abbey trade dresses share certain features, the overall impressions created by the two trade dresses differ meaningfully.

Ornua argues that the parties' trade dresses are similar because they both use "the same silver foil background and uncluttered design on a package with the same size, shape, profile and weight, . . . use similar centered text with stylized arched wording above one image element, with trademark logos using a similar Celtic-style font and a similar green color." Opp. at 15. Additionally, Ornua notes that both trade dresses use similar wording and "indicate the butter product is made from milk from grass fed cows. *Id.*

The similarities Ornua identifies are undeniable. But they are also described at a high level of generality, and many of these similarities are common to the trade dresses on the packages of other butters. *See Capri Sun*, 595 F. Supp. 3d at 190 (rejecting argument that trade dresses were similar based on descriptions at high level of generality). The differences between the two trade dresses vastly outweigh their similarities. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) ("However, in a trade dress infringement case the question is not how many points of similarity exist between the two packages but rather

whether the two trade dresses 'create the same general overall impression.'") (quoting *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979)).

The overall impressions of the Kerrygold and Tipperary trade dresses are unlikely to cause confusion among reasonably prudent purchasers. First, each trade dress prominently displays their respective brand name. The name "Kerrygold" assumes a significant portion of the Kerrygold Trade Dress and is placed in the center of the package. "Kerrygold" appears in a white font sitting in front of a shamrock green quadrangle. The contrast between the white font and green shading further accentuates and draws attention to the brand name. Likewise, the name "Tipperary" occupies a large portion of the Abbey Trade Dress. In fact, "Tipperary" appears in the largest font of any text on the package. "These brand names clearly signal the products' different sources and go far towards eliminating any possible confusion." *Capri Sun*, 595 F. Supp. 3d at 191 (analyzing the percentage of a package occupied by a brand's name) (quoting *Bristol-Myers Squibb*, 973 F.2d at 1046); *see also Nabisco*, 220 F.3d at 46–47 (finding no likelihood of confusion between two gum packages where each package prominently displayed its respective brand's name) (collecting cases).

Next, although both trade dresses utilize a Celtic-style font, each font is evidently distinct. The font on the Kerrygold Trade Dress is a clean, sans-serif font, whereas Abbey's package uses a font with long serifs, providing a more antique and anachronistic look. Additionally, as stated above, the name "Kerrygold" is displayed in a white font with no border while "Tipperary" appears in gradating shades of green with a white border. "Tipperary" is also slightly arched while "Kerrygold" has no curve.

Third, the two packages also contain different phrases and otherwise arrange any similar phrases in different places. For instance, the top of the Tipperary package states, "IMPORTED

FROM IRELAND." No such statement appears on the Kerrygold Trade Dress. At the top of the Kerrygold package is a note that the butter contains "MILK FROM IRISH GRASS-FED COWS" accompanied by an ovular gold seal indicating the same. Abbey's Trade Dress lacks any seal and indicates at the bottom of the package that its butter is "MADE WITH MILK FROM GRASS-FED COWS," without noting the national origin of those cows.

Furthermore, the focal point of each trade dress further dispels any possibility of confusion. *See It's a New 10, LLC v. Harmon Stores, Inc.*, No. 17-CV-4231 (JPO), 2017 WL 3208611, at *3 (S.D.N.Y. July 28, 2017) ("Third, and most significantly, the focal points of the two products—the orange-and-white circle in the center—are wholly different.") (comparing the packaging of personal care products). The focal point of the Kerrygold Trade Dress is the green quadrangle with the "Kerrygold" brand name and depiction of a cow grazing tufts of grass. On the other hand, the focal point of the Abbey Trade Dress is the name "Tipperary," which sits against the silver foil, and the flag of Ireland. These images share little relation and are entirely distinct.

Finally, many of the features that Ornua argues would cause confusion are common to other butter trade dresses. *See Capri Sun*, 595 F. Supp. 3d at 165–66 (comparing juice packaging and finding that "some basic elements of these outer designs appear to be nearly universal—the brand name generally appears at the top, graphics of fruit generally appear in or around the center, and the name of the flavor generally appears somewhere below the brand name"). For instance, Ornua states that both packages are the same size, shape, and weight, contain similar wording indicating that the butter is "'PURE IRISH BUTTER' / 'PURE UNSALTED IRISH BUTTER,'" and advertise that the butter is made from milk from grass-fed cows. Opp. at 15.

However, even a cursory glance at the collection of butter packages Ornua assembled in its statement of material facts reveals that butter packages commonly share the same size, shape and weight:



Ornua SMF ¶ 24.

Indeed, each butter package displayed weighs either eight or sixteen ounces and all packages form a similar rectangular shape. *Id.* Further, numerous of the butters also indicate information about the cows from which the butter is derived, as well as the geographic origin of the butter. *Id*. Thus, because these elements are common among butter packages more generally, they are unlikely to cause consumers to be confused between the Kerrygold and Tipperary packages.

Put simply, the parties' butter packages are markedly dissimilar and do not create the same overall impression. *See Nasbisco*, 220 F.3d at 47 ("The cumulative effect of the differences between the parties' products and in the commercial presentation of their marks creates distinct

marketplace impressions.") They are unlikely to confuse consumers. Accordingly, the Court finds that this factor overwhelmingly favors Abbey.

### C. Competitive Proximity of the Products

The proximity of the products factor "concerns whether and to what extent the two products compete with each other and the nature of the products themselves and the structure of the relevant market." S*chutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 279 (S.D.N.Y. 2016) (internal citations and quotation marks omitted). There is no dispute that both products are the same—imported, unsalted Irish butter—and compete directly, often being sold in the same stores. *See* JSMF ¶¶ 8–10. This factor therefore favors Ornua. *See Kind LLC,*, 2014 WL 2619817, at *8; *Luv n' Care, Ltd. v. Mayborn USA, Inc.*, 898 F. Supp. 2d 634, 648 (S.D.N.Y. 2012).

### D. Bridging the Gap

"Because the parties in this case are already competitively proximate, there is no gap to bridge and so this factor is irrelevant." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

### E. Evidence of Actual Confusion

"Although evidence of actual confusion is not necessary to prevail on a trademark infringement claim, the courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000), *aff'd*, 234 F.3d 1262 (2d Cir. 2000). Ornua adduces no evidence of actual confusion but argues that this factor is neutral because sales of Tipperary butter "are minimal" and the product has only been on the market for three years. Opp. at 20. This argument fails. Courts in this district have found the absence of evidence of consumer confusion to weigh against a plaintiff

where an allegedly infringing product was sold for a period of three years or less. *See Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) (stating that "no evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal"); *see also Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (finding that "the plaintiff had ample opportunity to come forward with evidence of actual confusion" where defendant's product was in distribution for over two years). Ornua had ample time to collect and present this evidence, but it failed to do so. Accordingly, this factor favors Abbey.

### F.  Abbey's Bad Faith

"In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted to exploit the good will and reputation of a senior user by adopting the [trade dress] with the intent to sow confusion between the two companies' products." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) (internal quotation marks and citation omitted). "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol-Myers Squibb*, 973 F.2d at 1044 (internal citation omitted). Additionally, a defendant's "'actual or constructive knowledge'" of the prior use's mark or dress may indicate bad faith." *Paddington Corp.*, 996 F.2d at 587 (internal citation omitted).

Importantly, "there is a considerable difference between an intent to copy and an intent to deceive." *Capri Sun*, 595 F. Supp. 3d at 172 (internal citation omitted). Indeed, "the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Nora Beverages*, 269 F.3d at 124 (quoting *Streetwise Maps*, 159 F.3d at 745). "Where the junior user prominently displays its own

20

mark and uses a trade dress dissimilar to the senior user's, such efforts negate an inference of intent to deceive consumers as to the source of the product." *Capri Sun*, 595 F. Supp. 3d at 172–73 (cleaned up).

As evidence of Abbey's bad faith, Ornua cites to emails between Abbey's owner and its package designer discussing the Tipperary package. The emails occurred after Abbey's owner learned that a retail grocer would no longer sell Kerrygold butter and approached Abbey to supply a new Irish butter. Ornua SMF ¶¶ 44–45. In the email conversation, Abbey's owner sent images of the Kerrygold Trade Dress to Abbey's package designer, who later produced mockups of the Tipperary Trade Dress, nearly the same one Abbey uses today. *Id.* ¶¶ 50–55. None of the emails discuss the Kerrygold Trade Dress. Ornua next cites to an email chain wherein on June 26, 2020, Abbey's supplier, Lakeland, warns Abbey's owner that "Ornua could throw the weight of their trademarks (including trade dress) into legal proceedings against . . . Tipperary Brand. For example – Ornua have [sic] a specific trademark for the gold foil and green writing, so it is important Tipperary don't walk into the same issue as Lakeland did." ECF No. 53-23 at 2. On August 5, 2020, Abbey's owner instructed the package designer to change the packaging for its salted butter from gold foil to black foil but did not change the silver packaging on the unsalted butter. Ornua SMF ¶¶ 71–72.

Even viewing this evidence in the light most favorable to Plaintiffs, Ornua has failed to demonstrate that Abbey created the Tipperary Trade Dress with the intent to deceive consumers. Ornua's evidence demonstrates at most that Abbey intended to imitate features of Kerrygold's packaging. But none of the evidence cited suggest that Abbey intended to deceive consumers into believing that its butter was made or sponsored by Kerrygold. *See Fun-Damental Too*, 111 F.3d at 1005 (2d Cir. 1997) ("Hence, in the absence of evidence, apart from proof of copying,

that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying."); *Kind LLC*, 2014 WL 2619817, at *11 (finding no bad faith where the evidence presented revealed that the alleged infringer used the plaintiff's trade dress as a model for its design); S*chutte*, 193 F. Supp. 3d at 282 ("[T]he memo only demonstrates copying, it does not show that the copying was done with an intent to deceive customers.").

Further dispelling an inference of Abbey's bad faith is the fact that the Tipperary Trade Dress prominently displays Tipperary's brand name. *See Nora Beverages, Inc.*, 269 F.3d at 125 ("[B]y placing its labels prominently upon its bottles, PGA negated an inference of intent to deceive consumers as to the source of its product."); *LVL XIII Brands*, 209 F. Supp. 3d at 674 ("That LV prominently displayed its own logos on the OTR Sneaker further undermines the notion that it sought to pass the shoes off as LVL XIII's."); *Kind LLC*, 2014 WL 2619817, at *11 ("The fact that the MOJO packaging prominently displays the MOJO mark and also displays the Clif mark . . . negates an inference of intent to deceive consumers as to the source of the product.").

Finally, although it is undisputed that Abbey had actual and constructive notice of the Kerrygold Trade Dress, JSMF ¶ 11, "prior knowledge of a senior user's mark does not, without more, create an inference of bad faith." *Asset Co IM Rest, LLC v. Katzoff*, No. 23-CV-9691 (JPC), 2024 WL 167333, at *9 (S.D.N.Y. Jan. 16, 2024). This factor thus favors Abbey.

### G.  Quality of Abbey's Product

The parties have not presented any evidence regarding the quality of their respective butters. Accordingly, this factor is neutral. *See It's a New 10, LLC*, 2017 WL 3208611, at *5 (finding the quality of defendant's product factor to be "inapplicable, as there has been no evidence introduced on the respective quality of the two products").

### H.  Consumer Sophistication

This factor requires the Court to consider "the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Kind LLC*, 2014 WL 2619817, at *11 (internal citation and quotation marks omitted). "Where relatively low-priced items are intermingled on supermarket shelves, consumers are likely to purchase these types of low-priced food items without devoting much time and attention to making the decision or scrutinizing the packaging," which increases the likelihood of consumer confusion. *Capri Sun*, 595 F. Supp. 3d at 177 (cleaned up). This factor favors Ornua because both parties' unsalted Irish butters are low priced items sold on supermarket shelves, often in the same stores.

### I.  The Balance of the *Polaroid* Factors Favor Abbey

Summary judgment in Abbey's favor is warranted. Some *Polaroid* factors do favor Ornua, including competitive proximity, consumer sophistication, and strength of Ornua's trade dress, albeit slightly. And other factors—quality of product and bridging the gap—are neutral. The remaining factors, however, strongly favor Abbey. Specifically, the evidence presented demonstrates no actual consumer confusion, no bad faith on the part of Abbey, and, most importantly, that the Kerrygold and Tipperary trade dresses are sufficiently distinct and dissimilar. Accordingly, no reasonable jury could find likelihood of confusion. *See Capri Sun*, 595 F. Supp. 3d at 192 (granting summary judgment in favor of defendant on likelihood of confusion in trade dress infringement claim where, despite some *Polaroid* factors favoring plaintiff, there was no evidence of actual confusion, bad faith, and the trade dresses were dissimilar); *LVL XIII Brands*, 209 F. Supp. 3d at 688 (holding that defendant was entitled to summary judgment because "no reasonable factfinder could conclude that there is a likelihood of

confusion" given "the obvious differences between the two marks"); *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 191 (S.D.N.Y. 2011) (determining that no reasonable juror could find likelihood of confusion because the marks in question were distinct and there was no evidence of actual confusion or bad faith, despite the remaining *Polaroid* factors favoring plaintiff); *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166–67 & n.5 (2nd Cir. 2004) (affirming summary judgment for defendant based on finding that the similarity, actual confusion, and bad faith factors favored defendant).

Therefore, Abbey's motion for summary judgment is granted on Ornua's Lanham Act claims for trade dress infringement and unfair competition. *See LVL XIII Brands*, 209 F. Supp. 3d at 678 ("The Court therefore holds that there was no likelihood of confusion between the parties' toe plates, and that a reasonable juror could not so find. This ruling supplies an independent basis for granting [defendant's] motion for summary judgment on" plaintiff's trade dress and unfair competition claims).

## III.    Ornua's New York State and Common Law Claims for Trade Dress Infringement, Deceptive Practices, and Unfair Competition Fail as a Matter of Law

"The standard for proving trade dress infringement under New York common law generally parallels the standard under the Lanham Act, except that there is no requirement to show secondary meaning for distinctive designs." *Michael Kors, LLC v. Su Yan Ye,* No. 18-CV-2684 (KHP), 2019 WL 1517552, at *4 (S.D.N.Y. Apr. 8, 2019) (internal citation omitted); *see also Tiffany (N.J.) Inc. v. eBay Inc.*, 600 F.3d 93, 101 n.6 (2d Cir. 2010) ("[C]auses of action under both the Lanham Act and New York State common law . . . are composed of the same elements. We therefore analyze them together."). Similarly, the standard for "unfair competition under the Lanham Act is virtually identical to that under New York common law, except that the latter requires an additional showing of bad faith." *Lopez v. Adidas Am., Inc.*, No. 19-CV-7631

24

(LJL), 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020) (internal citations omitted). Finally, a deceptive trade practices claim brought pursuant to New York General Business Law Section 349 requires "a showing that a reasonable consumer would have been misled by the defendant's conduct." *LVL XIII Brands*, 209 F. Supp. 3d at 678. Courts in this district have found that a consumer would not have been misled, and therefore a Section 349 claim fails as a matter of law, where a plaintiff fails to establish that the alleged infringer's conduct created a likelihood of confusion. *Id.* at 679.

Because Ornua cannot establish a likelihood of confusion, Abbey is entitled to summary judgment on Plaintiffs' New York State trade dress infringement, unfair competition, and deceptive trade practices claims. *See Wonderful Co. LLC*, 2022 WL 4585344, at *5 ("As described above, Plaintiffs do not plausibly allege a claim under the Lanham Act. Therefore, this common law claim necessarily fails.").

## IV.    The Parties' Motions to Seal Are Denied

The Court now turns to the parties' motions to seal. On February 12, 2024, Ornua filed a letter-motion requesting to file its memorandum of law, statement of material factors, and the Declaration of Kate Saul in a redacted form. ECF No. 45. On February 26, 2024, Abbey filed a letter-motion requesting to redact or seal portions of its reply brief and the Declaration of Stephen L. Baker. ECF No. 59. The Court first analyzes Ornua's sealing request and then addresses Abbey's request, denying both.

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id.* (quoting

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch*, 435 F.3d at119–20.[2] First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id*. at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id*. Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120.

The Court must balance "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. Courts should also consider the "nature and degree of injury" that may result from disclosure, the "reliability of the information," and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Amodeo*, 71 F.3d at 1051. "If such factors outweigh the value to the public of accessing the document at issue, then that document should be sealed." *Matter of Upper Brook Cos.*, No. 22-MC-97 (PKC), 2023 WL 172003, at *1 (S.D.N.Y. Jan. 12, 2023).

---

[2] Because the *Lugosch* common law framework "is dispositive of the motion to seal, the Court need not undertake the First Amendment analysis." *In re Telegraph Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL 5770115, at *6 (S.D.N.Y. Sept. 6, 2023).

The documents Ornua and Abbey seek to seal or redact are materials submitted in connection with a motion for summary judgment and are therefore "unquestionably judicial documents under the common law" and subject to a strong presumption of public access. *Lugosch*, 435 F.3d at 123. Regarding Ornua's motion, there is an even stronger presumption of access because much the information Ornua seeks to redact, including its advertising expenditures, sales data, and Kerrygold's market share, is relevant to the Court's analysis in the underlying dispute. *See GSC Logistics, Inc. v. Amazon.com Servs. LLC*, No. 23-CV-5368 (JGLC), 2023 WL 4993644, at *4 (S.D.N.Y. Aug. 4, 2023).

Ornua argues that competing considerations militate in favor of sealing or redacting its memorandum of law, statement of material factors, and the Declaration of Kate Saul because they contain business information, including confidential sales and market share information obtained from a non-party. ECF No. 45 at 1–2. "The demonstration of a valid need to protect the confidentiality of confidential and proprietary business information may be a legitimate basis to rebut the public's presumption of access to judicial documents." *Lexington Furniture Indus., Inc. v. Lexington Co., AB*, No. 19-CV-6239 (PKC), 2021 WL 1143694, at *2 (S.D.N.Y. Mar. 24, 2021).

However, "[t]he party opposing disclosure [of a judicial document] must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id.* Against a substantial presumption of access, Ornua has failed to meet this burden. Although Ornua cites to numerous cases showing that courts in this district seal business information in filings, it fails to specify any harm that would

result from public access to these documents. Indeed, Ornua only mentions harm once in its motion, stating that "public disclosure only risks competitive harm to Ornua, and to non-party Circana." ECF No. 45 at 3. Plaintiffs' discussion of harm in the Declaration of a Kate Saul proves similarly anemic. There, Ms. Saul, Vice President of Marketing at Ornua Foods North America, Inc., states only that she "*believe[s]* that Ornua would be competitively harmed" by public access to these documents. ECF No. 52 at 1 (emphasis added). Such a broad, conclusory allegation of harm, however, is insufficient to overcome the presumption of access. *See In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *6.

Abbey likewise fails make a particular and specific demonstration of harm. In its motion to seal, Abbey notes that some of the documents and information in its reply brief and the Declaration of Stephen L. Baker "were produced by Ornua and designated 'Attorneys' Eyes Only,' in response to discovery requests." ECF No. 59 at 1. Abbey does not specify what harm would come from public disclosure of the documents or information and does not cite to any cases in support of its motion. Such a meager showing is insufficient to overcome the common law presumption of access. *See Shaf Int'l, Inc. v. First Mfg. Co.*, No. 20-CV-1242 (PKC), 2024 WL 2962143, at *2 (E.D.N.Y. June 12, 2024) (denying motion to seal where "documents at issue were previously designated as 'Confidential Attorney's Eyes Only' by the parties during discovery" but the parties failed to identify "any other compelling reasons that explain why the Court should place the documents at issue under seal or require their redaction").

Accordingly, the Court denies both parties' motions to seal.

## CONCLUSION

For the reasons stated above, Abbey's motion for summary judgment is GRANTED. Ornua and Abbey are ORDERED to refile ECF Nos. 49, 51, 52, 61, and 62 publicly on the docket in unredacted form.

The only remaining claim is for trade dress dilution under New York Law. As such, the Court, by separate Order, will direct the parties to show cause as to why this claim should not be dismissed for lack of subject matter jurisdiction.

The Clerk of Court is directed to terminate ECF Nos. 44 and 68.

Dated:  September 30, 2024
        New York, New York

                                    SO ORDERED.

                                    _Jessica Clarke_
                                    _____

                                    JESSICA G. L. CLARKE
                                    United States District Judge